UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 12-10734-RGS

NEW ENGLAND CARPENTERS CENTRAL
COLLECTION AGENCY et al.

v.

LABONTE DRYWALL COMPANY, INC.

FINDINGS OF FACT, RULINGS OF LAW,
AND ORDER AFTER A NONJURY TRIAL

June 5, 2014

STEARNS, D.J.

Based on the credible testimony of the witnesses at trial and the supporting exhibits, I make the following findings of fact.[1] I also accept and incorporate as true the facts stipulated to by the parties.

1. Plaintiff Trustees are fiduciaries for the pension, annuity, health benefits, vacation and training fund fringe benefit plans named in the Complaint (the Funds). Stipulated Facts ¶ 1. Plaintiff New England

---

[1] There is little disagreement over the basic facts. Consequently, I have relied heavily on the parties' proposed findings. Similarly, there is no disagreement over the applicable law, which is wholly contractual. The parties' dispute centers on the extent of any continuing contractual obligation on the part of defendant to submit to plaintiffs' audit request.

1

Carpenters Central Collection Agency (Agency) was established by the New England Carpenters Pension Fund and has been designated by the Trustees of each of the Funds and by the Union to collect all monies owed to the Funds and others by employers pursuant to collective bargaining agreements with the Union and to conduct audits on behalf of the Trustees of the Funds. *Id.*

2. The Funds are jointly administered, multi-employer plans within the meaning of § 3(37) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1002(37). *Id.* The Funds are "employee pension benefit plans" and "employee welfare benefit plans" within the meaning of § 3(1) and (2) of ERISA, 29 U.S.C. § 1002(1) and (2). *Id.*

3. Defendant Labonte Drywall Company (Labonte) was a New Hampshire corporation engaged in commercial drywall work until May of 2007, when it converted to a limited liability company under New Hampshire law. *Id.* ¶ 2; Trial Transcript (Tr.) at 67. Clermont Labonte is (and was at all relevant times) the sole member and owner of Labonte. *Id.* Clermont Labonte's son, Dany Labonte, was authorized to act as Labonte's agent in its responses to plaintiffs' audit requests. Tr. at 72, 76.

4. On January 31, 1996, Clermont Labonte, on behalf of Labonte, signed a State-Wide Agreement with the United Brotherhood of Carpenters and

Joiners of America. Stipulated Facts ¶ 4; Tr. at 70. Paragraph 1 of the State-Wide Agreement provided that:

> Labonte] accepts and agrees to abide by the collective bargaining agreements between the various contractor associations and the unions of the United Brotherhood of Carpenters and Joiners of America in the Commonwealth of Massachusetts wherever those contracts shall apply. [Labonte] agrees that it shall abide by any amendments or successor agreements negotiated by the contractor associations and the local unions.

5. The State-Wide Agreement further provided that "[t]he duration of this statewide agreement shall be co-extensive with the terms set out in the collective bargaining agreements referred to in paragraph 1 unless either party to this statewide agreement gives notice of termination of this agreement in accordance with the applicable notice provisions in the collective bargaining agreement referred to in paragraph 1." *Id.* ¶ 2.

6. Article 31 of the Collective Bargaining Agreement (CBA) in effect during the period September 1, 2005, through August 31, 2009, provided as follows.

> This agreement will expire on August 31, 2009 except that if neither party to this Agreement gives notice *in writing* to the other party or before July 1, 2009 that it desires a change after August 31, 2009, then this

3

> Agreement will continue in effect until August 31, 2010 and so on each year thereafter unless on or before July 1 of each year thereafter, a notice is given by either party.

*Id.* ¶ 6. (Emphasis added).

    7. The CBA required signatory employers, such as Labonte, to make contributions to the Funds in accordance with its terms. Stipulated Facts ¶ 7; Tr. at 6. These contributions were to be made on a weekly basis on behalf of all employees covered by the CBA. Stipulated Facts ¶ 7; Tr. at 10.

    8. The CBA also obligated signatory employers to comply with the terms of the Trust Agreements for each of the eleven associated benefit Funds. Exs. 2 & 3. Section 3.2 of the Trust Agreements for the Annuity, Pension and Health Funds provided, in relevant part, as follows.

> The Trustees, or their authorized representatives, upon reasonable notice, may examine the pertinent payroll records of any Employer, including, but not limited to, all quarterly and yearly payroll tax returns, payroll listings, time reports, individual earnings records and checks, whenever such examination is deemed necessary by the Trustees, or their authorized representatives, in connection with the proper administration of the Trust Fund. . . . In the event that the Trustees shall incur attorney's fees or other expenses in

> order to enforce the Trustees' right to audit the records of any Employer, such attorney's fees or other expense shall be charged against such Employer regardless of whether the employer shall have been delinquent in contributions to the Trust Fund for the period of the audit.

Exs. 4-6, § 3.2.

9. Albert Peciaro has served as the Director for Contractor Relations for the Union since 2005. Tr. at 41-42. Contractor Relations is responsible for maintaining and overseeing the contractual relationship between the Union, various employer associations, and individual employers. *Id.* at 42.

10. To terminate a collective bargaining relationship, either a contractor or the Union must submit written notice to the other of the desire to do so. *Id.* at 43. Neither the Agency nor the Funds are parties to any collective bargaining agreement. *Id.* at 44. Peciaro has received approximately twenty-four termination notices from signatory employers during the past six or seven years. *Id.* at 48. During his eight years as the Director of Contractor Relations, Peciaro has never received a notice of termination that was

5

originally sent to the Agency, though "at times [the notice] is sent directly to a Local." *Id.* at 51.

11. Contractor Relations notifies the Agency of any employer terminations. *Id.* at 49. The Union has never received a written notice of termination from Labonte. *Id.* at 49-50. According to Dany Labonte, any correspondence he sent regarding the CBA was addressed to 350 Fordham Road – the address of the Agency and the Funds' offices. *Id.* at 83, 112.

12. The Agency never received notification from Contractor Relations that Labonte was no longer a signatory employer. *Id.* at 12. Nor did Contractor Relations ever ask the Agency to compute Labonte's withdrawal liability. *Id.* at 47-48.

13. The Agency oversees the auditing of between 600-800 employers signatory to collective bargaining agreements with the Union. *Id.* at 7. Signatory employers are generally audited on a three-year audit cycle. *Id.* at 10. The Agency conducts approximately 150-200 audits per year. *Id.* Among the signatory employers regularly audited by the Agency are those that indicate they are not actively performing work. *Id.* at 10-11.

14. Pursuant to the CBA and the respective Trust Agreements, the Trustees of the employee benefit Funds may demand signatory employers furnish all pertinent payroll records to the Agency for inspection and review to ensure compliance. Trial Ex. 2, Art. 10 § 6; Exs. 4-6, § 3.2. The purpose of the CBA audits is to determine, among other things, whether any covered employees have worked hours for which contributions have not been remitted. Tr. at 11.

15. By letter dated January 8, 2007, the Agency notified Labonte that an audit would be conducted for the period of January 1, 2004, through the end of 2006 (2007 Audit). Ex. 9.

16. Leo Donohue conducted the 2007 Audit of Labonte. Tr. at 29. At the time, Donahue was a payroll auditor for the Agency. *Id.* at 20, 27. He is not employed directly by the Union or any of its affiliates. *Id.* at 20, 28- 29, 51. Labonte provided materials requested during the 2007 Audit. *Id.* at 13, 39, 41. Dany Labonte informed Donohue in a letter dated April 3, 2007, that "Labonte Drywall has not had work or done work in the union now since December of 2005. The last job we did was Manchester Place for Moriarty in Manchester, NH. We lost so much money again on another union job that we are no longer bidding or doing any more union work." Ex. 22. The letter

addressed to Donohue contained Dany Labonte's name in type, but without a corresponding signature. *Id.*; Tr. at 104.

17. Donohue did not recall receiving the April 3, 2007 letter. *Id.* at 31. The only written correspondence Donohue recalls receiving from Dany Labonte during the 2007 Audit was a letter dated December 28, 2007, explaining bonus payments that Labonte had made to some of the carpenters who had worked on the Manchester Place project. Ex. 11; Tr. at 31, 91. Again, Dany Labonte's letter included his name, but was unsigned. Ex. 11.

18. At the conclusion of the 2007 Audit, Donohue prepared a summary report claiming that Labonte had underreported a total of 24 hours of work by 38 employees in 2004; 4,765 hours of work by 74 employees in 2005; and 40 hours of work by one employee in 2006. Ex. 10; Tr. at 29-30. There is no evidence in the record that any steps were taken by the Agency to enforce the collection of payments on the underreported hours. *Id.* at 24, 73, 91-92. Nor have plaintiffs offered any evidence countering Labonte's assertion that it gave up all union-related work at the end of 2005, *id.* at 68, 86, or that it ceased doing carpentry and drywall installation in March of 2006. *Id.* at 56, 95.[2]

---

[2] Plaintiffs were aware that Labonte had ceased purchasing Union stamps and submitting work reports to the Agency in or around March of 2006. *Id.* at 10, 21, 23, 59.

8

19. In a letter dated February 11, 2010, the Agency informed Labonte that an audit would be conducted for the period of January 1, 2007, through December 31, 2009 (2010 Audit). Ex. 12.

20. On or about April 6, 2010, the Union through its counsel, Christopher Souris, sent Clermont Labonte notice of an investigation of "the extent to which union companies and their officers or other principals may be operating, managing or controlling a non-union company in violation of the collective bargaining agreement." Ex. 13. The letter informed Clermont Labonte that the Union had determined that his "Company [Labonte Drywall] is operating nonunion companies," and enclosed a questionnaire asking for seventy-nine (79) categories of information covering a six-year time period – January 1, 2004, to the date of the letter. *Id.* The questionnaire was to be returned within ten days. That same day, Souris also sent a letter to Clermont Labonte on behalf of the Agency demanding that Labonte cooperate with the 2010 Audit. Ex. 19.

21. In an email dated July 1, 2010, Labonte's newly-retained counsel, Diana Wieland, informed Souris that while Labonte would provide the requested information, Labonte believed that it had no existing bargaining relationship with the Union. Ex. 14. On July 19, 2010, in a letter to Souris,

Wieland responded to the 2010 Audit questionnaire.[3] Ex. 15. She repeated the assertion that Labonte had ceased performing carpentry or drywall installation work in December of 2005, and that "the Funds [had] knowledge that Labonte Drywall no longer has a bargaining relationship with the Union." *Id.*

22. In a letter dated August 31, 2011, the Agency requested that Labonte expand the production of its payroll records for the 2010 Audit through the date of the letter. Ex. 20.

23. Labonte did not respond to either the February 11, 2010, or the August 31, 2011 audit requests, despite two demands from Attorney Souris that it do so. Exs. 19, 21.

24. Plaintiffs filed this action on April 25, 2012, seeking to enforce compliance with an audit of Labonte's payroll and employment records for the period January 1, 2007, through August 31, 2011. Stipulated Facts ¶ 3; Ex. 20; Tr. at 16.

---

[3] As plaintiffs point out, the answers to the questionnaire suggested that Labonte's accounting practice fell well short of GAAP standards.

## ULTIMATE RULINGS OF FACT AND LAW[4]

I credit Dany Labonte's testimony that the April 3, 2007 letter to Donahue was mailed and was intended as a written termination of the CBA between the Union and Labonte. While the phrasing of the letter was inexact, I agree with Labonte that the CBA does not require any specific terminology to be effective, and that Dany Labonte's layman's choice of words was sufficiently clear to require, at least, some responsive inquiry from the Union or the Funds. However, nothing ensued from either entity on the subject. After 2007, communication did not resume until February 11, 2010, when a form letter stating that Labonte had been selected for a random audit was mailed to Clermont Labonte.[5]

---

[4] Plaintiffs devote much of their Proposed Rulings of Law to an embellishment of the duty of the Agency under ERISA to enforce the CBA obligations of employers for the benefit of their unionized employees. None of this, however, is a matter of dispute. The only issue in this case is whether there was a valid CBA for the Agency to enforce.

[5] According to testimony at trial, the Agency's practice is to stop sending the Wage and Benefit Package to signatory employers when they terminate the collective bargaining relationship. Tr. at 58, ll. 5-11. I credit the testimony of Dany Labonte that Labonte last received a copy of the Union Wage and Benefit Package for the period September 1, 2006, through February 28, 2007. Tr. at 99.

I do not find credible plaintiffs' assertion that the Funds and the Union operated as wholly separate entities and that the Union cannot therefore be charged with knowledge of a CBA termination notice delivered to the Funds. *See* Pls.' Proposed Rulings 6, 10. This is particularly so in light of the fact that the same attorney (Souris) represented both entities and pursued their interests as a joint endeavor (as evidenced by the April 2010 correspondence with Labonte and the later exchanges in July 2010 with Attorney Wieland).[6]

Because the CBA had been terminated, plaintiffs had no legal right to conduct an audit of Labonte's payroll for the period from January 1, 2007, through August 31, 2011. *DeVito v. Hempstead China Shop, Inc.*, 38 F.3d 651,

---

[6] Plaintiffs testified that the Union is in regular communication with the Agency regarding the status of employers who are no longer active in the Union or who request to terminate the collective bargaining relationship. Tr. at 8-9, 49.

653-654 (2d Cir. 1994). Judgment must therefore enter for defendant.[7]

ORDER

For the foregoing reasons, judgment will enter for Labonte. The Clerk will enter a separate Order of Judgment consistent with this decision.

SO ORDERED

/s/ Richard G. Stearns
_____
UNITED STATES DISTRICT JUDGE

---

[7] Labonte also raises laches as a defense. "The equitable defense of laches will bar a party from asserting a claim if the party so unreasonably delayed in bringing the claim that it caused some injury or prejudice to the defendant." *Polaroid Corp. v. The Travelers Indem. Co.*, 414 Mass. 747, 759-760 (1993); see also *Costello v. United States*, 365 U.S. 265, 282 (1961). The doctrine of laches is "premised on the maxim *vigilantibus non dormientibus aequitas subvenit*, equity aids the vigilant not those who slumber on their rights." *Cornetta v. United States*, 851 F.2d 1372, 1375 (Fed. Cir. 1988). While the application of the doctrine is within the sound discretion of the district court, *Puerto Rican-American Ins. Co. v. Benjamin Shipping Co., Ltd.*, 829 F.2d 281, 283 (1st Cir. 1987), here it is not clear that any actual prejudice has been suffered by Labonte. If anything, the passage of time has made it impossible for plaintiffs to reconstruct Labonte's exact employment practices in the years since the end of 2006. The best argument for the application of the doctrine may lie in the fact that the Agency had allowed the statue of limitations to run on any recovery for the allegedly unreported hours in 2004 and to April 25, 2005. However, given the renunciation by Labonte of the CBA, it is not necessary for the court to decide whether plaintiffs are correct in their assertion that laches uniquely does not apply to suits brought by ERISA-covered trust funds. *See* Pls.'s Proposed Supplemental Ruling 2. *But see Fanning v. S.M. Larusso & Sons, Inc.*, 2004 WL 187330, at *3 n.1 (D. Mass. Jan. 26, 2004) (Stearns, J.).